[No. 3448.]

### DANIELS V̇. STOCK.

1. APPEALS—*Abstracts and Briefs—Unnecessarily Voluminous,* condemned as retarding the progress of the courts, without advancing justice.

2. —— *What May Be Assigned for Error.* One who prays an instruction that particular evidence be considered by the jury for a limited purpose cannot assign error upon its admission.

3. —— *Harmless Error.* An instruction to the effect that an admission contained in the answer is competent evidence against the defendant is harmless, where the defendant as a witness on the stand makes the same admission.

4. MAXIMS—*Stare Decisis,* applies in its fullest sense only where property rights are involved.

5. PLEADINGS—*Answer—Inconsistent Defenses.* The code (Sec. 65) is not to be so construed as to permit the defendant to plead defenses so contradictory that the proof of one necessarily disproves the other.

Cunningham, J.

6. EVIDENCE—*Admissions in Pleading.* The unqualified admission by the answer of an allegation in the complaint is evidence of what is so admitted, even where the answer contains a general denial. But it seems such admission is not conclusive upon the defendant, but is to be considered in connection with all the other evidence in the case bearing upon the question.

Cunningham, J.

7. LIBEL—*Answer.* The defendant may plead the truth of the alleged libel or that it was a privileged communication, without admitting the publication.

8. —— *Privileged Communication — Abuse of Privilege.* The president of a mining company made a report to the company, in which, alluding to an action previously instituted by the plaintiff against the corporation, for an alleged personal injury, he denounced her as a blackmailer, declaring in substance that she ought to be sent to the penitentiary, that a prosecution against her ought to be commenced and thoroughly pressed, as a deterrent to fraudulent claims by other blackmailers. He mailed one copy of this report to the secretary, and one to the attorney of the company. It was circulated in pamphlet and published in a daily newspaper having a circulation of many thousands. The evidence warranted the jury in finding that defendant was responsible for the wide publicity given to his defamatory language. Held an abuse of privilege.

*Appeal from Denver District Court.* HON. HARRY C. RIDDLE, Judge.

Mr. GEORGE S. REDD, Mr. GEORGE STIDGER, Mr. JOHN HORNE CHILES, for appellant.

Mr. STEPHEN W. RYAN, Mr. HORACE N. HAWKINS, for appellee.

CUNNINGHAM, J.

We are confronted in this case with an abstract consisting of 747 pages, and briefs aggregating 212 pages, and 110 assignments of error. As the writer of this opinion views the record, the most important question presented is how the five members constituting this court, can be expected to find time to

read it understandingly.   The vital questions in-
volved in the appeal, we feel certain, could have been
adequately presented, and much more satisfactorily
considered, had but a fraction of the space actually
consumed, been occupied.   We suggest, in no spirit
of carping criticism, that unnecessarily voluminous
abstracts and briefs often serve to retard the prog-
ress of the courts, without advancing the interests
of the litigants.   The practice of filing such records
accounts, in no small degree, for the congested con-
dition of the dockets, about which much criticism is
heard, and the responsibility for which is not al-
ways justly placed.

Appellee, plaintiff below, brought this action in
the district court, to recover damages growing out
of an alleged libel.   Defendant was charged with
having published the following language of and con-
cerning the plaintiff, to wit:

"The Stock case is fully covered by the attor-
ney, so I will only add that because of the relation
of the woman's mother with the Big Five Company,
and, because of the sympathy that has been extended
to her on account of her claim that she was abused
and maltreated by her husband, in defending the
case care was taken not to bring out anything re-
flecting upon her character further than seemed to
be absolutely necessary.   No such care for a black-
mailer will be observed on a new trial, if the case
should ever come to trial again.     *     *     *

There is now in force an indemnity policy in-
suring us against damages for injury to either em-
ployes or patrons, and, while this insurance would
not cover such a verdict as they rendered in favor
of Mrs. Stock, I believe it will afford ample protec-

tion because of the vigorous and effectual manner
in which corporations furnishing this kind of insur-
ance prosecute and punish persons making false and
fraudulent claims. In this connection I wish to
bring to your attention a difference of opinion be-
tween Messrs. Redd (attorney for the company) and
Merrill (Secretary for the Company) on the one
side, and myself on the other. I believe that no
matter what the final result of Mrs. Stock's attack
upon us may be, we should vigorously prosecute her,
and that she should be sent to the penitentiary, as
I believe she can be, by the evidence in hand. I
believe this prosecution should be commenced and
earnestly pushed to a final decision, no matter what
the result, for even if we should finally fail to con-
vict, the very fact that in every instance where there
is any suspicion of fraud, there will be a thorough
investigation and prosecution if facts warrant, will
deter blackmailers from making fraudulent claims.
Such prosecution should also extend to any wit-
nesses against whom there is any evidence of per-
jury. Mr. Redd agrees with me as to witnesses, but
not as to the principal, while Mr. Merrill thinks'
nothing should be done.''

The undisputed facts are that the defendant
incorporated the above language in a typewritten
report made by him to the stockholders of the Big
Five Mining Company, of which he was president
and manager; that after dictating and revising his
report containing the above language, he mailed one
copy to its secretary and another to the attorney;
that this report was printed in pamphlet form, there
being several hundred copies of the pamphlet issued,
and that it was printed in the Daily Mining Record,

a paper published in the city of Denver, having a circulation of about 20,000; that the Mining Record charged for and collected from the Mining Company advertising rates for publishing the report, and the company also paid for printing the pamphlets. It seems that Mrs. Stock brought suit against Daniels, and others, prior to the making of this report, for damages she claimed to have sustained while taking a bath in a public bath house in Idaho Springs, owned by defendant and his associates. After the date of plaintiff's alleged injury, Daniels and his associates transferred the bath property to the Mining Company, the Company assuming all responsibility for any damages which plaintiff might establish by reason of her alleged injuries. Defendant was heavily interested in and was president and manager of the Big Five Mining Company. Mrs. Stock's suit for damages was tried in the district court, resulting in a judgment of $10,000 in her favor. It is this judgment, and the trial leading up to it, to which Daniels makes reference in his report to the stockholders of his company. These are substantially the facts, in so far as they are not seriously controverted. Defendant's answer to the complaint consisted, first, of a general denial; second, privileged communication, and, third, justification on the ground that the statements contained in the alleged defamatory matter were true.

1. Complaint is made of the wide latitude permitted by the trial court in cross-examination of certain of defendant's witnesses. In view of the large discretion properly lodged in trial courts in matters of this sort, and of the past unfriendly relations existing between plaintiff and certain of the

witnesses, we perceive no serious grounds for complaint on that score. Moreover, the consideration of much of this evidence was properly limited by instruction number seventeen, requested by the defendant. As to the admission of the evidence referred to in said instruction, appellant is in no position now to complain, since he asked that it be submitted to the jury for a certain limited purpose in said instruction prescribed. If he did not desire the jury to consider it at all, appellant should have tendered an instruction asking that it be entirely withdrawn from the consideration of the jury. Other evidence introduced on cross-examination, and of which defendant now complains, might have been similarly restricted, had a timely instruction to that effect been tendered.

2. The trial court gave instruction No. 9, which reads as follows:

"The jury is instructed that in this case, the defendant denies publication. It is not necessary that there should be any direct proof of publication. The establishment, to the satisfaction of the jury, of any fact or facts from which they may legally infer publication by the defendant, will be sufficient; and in this connection the jury is instructed that the admission of the defendant contained in his answer, that he 'used the words set out in the complaint', may be considered by the jury as competent evidence in the case, as tending to establish publication."

The court also permitted plaintiff to introduce certain paragraphs from defendant's answer, contained in the 2nd and 3rd defenses, wherein defendant used, in connection with pleas of privileged

occasion and justification, the following language, in substance: "that the defendant used the words set out in the second paragraph of the complaint in said report", etc.—referring to the alleged libelous words. Defendant predicates error on the action of the court in giving the aforesaid instruction, and in admitting that portion of the answer, which, by admitting the use of the alleged libelous language, contradicts the first defense, wherein the publication of the language is denied. Defendant asserts that the Code permits the pleading of inconsistent defenses, no matter if such defenses be so inconsistent with each other that the proof of one would *necessarily* disprove the other, and defendant cites numerous opinions from our supreme court and court of appeals to support his assertion. Our supreme court, it must be conceded, has frequently categorically held that inconsistent defenses might be set up in an answer. If the writer of this opinion were convinced that these rulings were meant to, and, when properly interpreted, did include defenses so contradictory that the proof of one necessarily disproved the other, he would feel that the question was foreclosed in this state, so far as this court is concerned, since an application for a reconsideration thereof could only be properly addressed to the supreme court. After a careful reading of every opinion he can discover, from both of the courts of last resort in this state, which in any wise refer to the question of inconsistent defenses, the writer is disposed to think that counsel for the defense, and probably the profession generally, have taken these opinions too literally, and carried them beyond the point they were intended to cover. Entertaining

this impression, he feels at liberty to give the subject further consideration, limiting, and intending to limit, his remarks strictly to that branch of the discussion properly applicable to such inconsistencies as have been already referred to.

Prof. Sunderlin, in his article on Pleading, in 31 Cyc. 147, et seq., considers the question of inconsistent defenses in all its phases. At page 149, he says:

"Even where there is no express prohibition (in the code) it is held in many jurisdictions that the privilege of pleading as many defenses as may exist is limited by the provision requiring pleadings to be verified by oath, nor can a defendant rely upon two defenses which are absolutely inconsistent with each other, the test of inconsistency being whether the proof of one necessarily disproves the other."

Continuing, and on page 151, the same author says:

"*And even in those states where inconsistent defenses may be pleaded, it is doubtful whether defendant would be allowed to plead and rely on two defenses so inconsistent that if one is true, the other must be false.*"

This subject is referred to in the following Colorado cases: *People v. Lothrop,* 3 Colo. 428-50; *Pike v. Sutton,* 21 Colo. 84; *Hill v. Groesbeck,* 29 Colo. 161; *Conrey v. Nichols,* 35 Colo. 473; *Duffield v. D. & R. G. R. R. Co.,* 5 Colo. App. 25; *Doll v. Bush,* 6 Colo. App. 294-7; *Travelers Ins. Co. v. Redfield,* 6 Colo. App. 190.

None of the cases from the court of appeals, for reasons that will readily appear when they are read, are believed to be in point. The only opinion

that has been written in this state, which appears to have given the question presented, and the authorities in support of it, careful consideration, was that of *People v. Lothrop, supra*. That the holding in the Lothrop case was *dictum* is made apparent by the following language appearing in the opinion:

"Even if we were to follow the modified rule adopted in New York (*Hopper v. Hopper,* 11 Paiges Ch. 46; *Hollenbeck v. Clow,* 9 How. Pr. 282) that the code will not tolerate several defenses that are so inconsistent with each other that the proof of one would necessarily disprove the other, *the defenses here interposed would not be obnoxious to that rule of construction.*"

In the case of *Hill v. Groesbeck, supra,* the court says:

"The plaintiff says that these defenses are inconsistent, and the proof of one disproves the other. This does not necessarily follow."

The writer finds in none of the Colorado cases defenses so squarely contradictory that the proof of one would necessarily disprove the other, and it is for this reason that he assumes that further discussion of this phase of the subject in this state is not precluded by the opinions already rendered. From the opinion in the case of *Seattle Natl. Bank v. Jones,* 13 Wash. 281; 48 L. E. A. 177-82, to which we shall later refer, we understand that the condition of the decisions in the state of Washington at the time the Jones case came before the supreme court, was not unlike the condition now existing in this state. In approaching the discussion, Justice Dunbar, who wrote the opinion in the Jones case, used this language:

"Cases from this court are cited by both counsel to sustain their respective contentions, but, whatever may have been said by this court on this subject heretofore, has been of the character of *dicta,* or an incidental reference to a question which was not material to the decision of the case under discussion. So we feel at liberty to enter into its investigation as an original proposition."

Moreover, it may not be amiss to suggest that, even if the assumption that the question of inconsistent defenses is not *stare decisis* in Colorado be unwarranted, yet the decisions by no possibility can have become a rule of property. Therefore, their reconsideration at this time would not necessarily tend to unsettle vested rights. The whole subject is one purely of practice, and involves the question of a proper application of both the letter and the spirit of what is known as the Reform, or Code Procedure. In *People ex rel v. LeFevre,* 21 Colo. 218-41, our supreme court has said:

"We are not unmindful of the rule that the maxim *stare decisis* is applicable in its fullest sense only where property rights are involved."

Sec. 65 of our code reads as follows:

"The defendant may set forth by answer as many defenses and counterclaims as he may have, whether the subject matters of such defenses be such as was heretofore denominated legal or equitable, or both, they shall refer to the causes of action which they were intended to answer in a manner by which they may be intelligibly distinguished."

This provision of the code, it will be seen, permits the defendant to plead, "as many defenses as he may *have*". If it be construed so as to permit

the defendant to plead two defenses where he has but one,—when one of the two defenses cannot possibly be true—then he is permitted to plead twice as many defenses as in truth and in fact he really has. In other words, the code is made to read that "the defendant may plead as many defenses as he can think of or imagine". It is difficult to follow the reasoning which makes of the defendant the favorite of the law in matters of pleading, while compelling the plaintiff to plead consistently. Sec. 65 of the code was never intended to confer upon the defendant the imperial quality which precludes the possibility of imputing error or wrongdoing to him.

That the defendant ought not to be haled into court ignorant of the real charge against which he must defend, is a trite rule of practice, and one universally recognized and strictly enforced. No reason can be perceived for permitting the defendant to cunningly hide, with false statements, from the court and his adversary, until trial day, the defense or defenses he proposes finally to rely upon.

The supreme court, in the case of Lothrop, *supra,* cited sec. 722 of Pomeroy's Remedies and Remedial Rights, a book that was then just upon the market, as authority for the unnecessary holding there made. The tendency of the courts to get back to the true spirit of the code, and away from the doctrine permitting inconsistent defenses, is made apparent by comparing the statement made by Prof. Pomeroy in the first edition of his work, issued in 1875, with the statement contained in his fourth edition. In the first edition he says:

"Assuming that the defenses are utterly inconsistent, the rule is established *by an overwhelming*

*weight of judicial authority,* that unless expressly prohibited by the statute, they may still be united in one answer.''

Thirty years later, the same author, in sec. 598 of the fourth edition of his work, uses this markedly qualified language:

''Assuming that the defenses are utterly inconsistent, *the rule is probably established by the weight of judicial authority* that unless expressly prohibited by statute, they may still be united in one answer.''

That Prof. Pomeroy recognized that he was following the weight of authority, rather than the weight of reason, even in his first work, and following the same with at least a shadow of reluctance, appears from a foot note appended to sec. 722 (1st Ed.) reading as follows:

''*Derby v. Gallup,* 5 Minn. 119-20, an action for taking and carrying away goods. The action contained two defenses; 1. A general denial. 2. Admitted the taking and justified it under process. The opinion of Atwater J. *is very able and difficult to be answered on principle.*''

Twenty years after the first edition of Prof. Pomeroy's work, the supreme court of Washington, in the case of *Seattle National Bank v. Jones, supra,* had occasion to pass upon this question. In an opinion devoted entirely to its consideration, the Washington supreme court refers to sec. 722 of Pomeroy's Remedies and Remedial Rights (his first edition), and points out conclusively that the authorities cited by Pomeroy, with the exception of a single case, did not at all support the doctrine there laid down. While the courts, in those cases, had

loosely used the term, "inconsistent defences," as a matter of fact, the defenses in the answers involved in the cases under consideration were not inconsistent at all, at least, not inconsistent in the sense that expression is here used. In his fourth and last edition, in a note to sec. 598, Prof. Pomeroy preserves his remarks concerning the Minnesota case, and cites the Washington case, which had so vigorously challenged his doctrine as announced in his first edition, along with an array of cases supporting it, from a dozen or more states, but attempts no reply to the argument made by the Washington court.

With great plausibility, the Washington court points out that the code provision permitting the defendant to plead as many defenses as he might have, was enacted for the purpose of simplifying lawsuits. Indeed, the very language of the act, "whether the subject matter of such defense be such as was heretofore designated legal, equitable, or both," indicates with reasonable clearness the object sought by those who framed the code. Being haled into court to defend against a law action, the defendant is permitted to set up and have litigated any equitable defense he may have. It would seem nothing more was intended by the language, and nothing contained in the section of the code quoted indicates any other intention.

"The theory," says the Washington court in the Jones case, "carried to its logical result, would permit a defendant who was sued upon a promissory note, to allege non-execution, want of consideration and payment. Under such allegations he would be permitted to swear that he never executed the note;

that he did execute the note, but that it was without consideration; and that he did execute the note, that the consideration was good, but that he had paid the same. Such a practice as this would not only be farcical, but absolutely wrong and immoral, and an encouragement of perjury.''

That it would delay and interfere with the due administration of justice, goes without saying. For an author of a practice act permitting such consequences, to term it, ''A Reform Procedure,'' would be self-deriding irony.

In the late case of *Choctaw O. & G. R. Co. v. Jackson,* 192 Fed., 792 at 800, the circuit court of appeals of the eighth circuit, speaking through Circuit Judge Smith, uses this language:

''No modern modification of the rules of pleading has changed the rule of the common law that 'all pleadings ought to be true.' ''

Citing Andrews' Stephen's Pleading, 478.

The following recognized authorities on code pleading are arrayed against the doctrine of inconsistent defenses, viz.:

Bates on Code Pleading, p. 349; Phillips Code Pleading, p. 261; Bliss Code Pleading, sec. 342 *et seq.*; Estee's Code Pleading, sec. 3381.

3. But, if it is error to assume that the question raised and here considered has not been settled beyond recall in this state; if my judgment in this respect has been led captive by a desire to see the spirit of the code respected, still there remains one feature of the subject on which no ruling, *obiter* or otherwise, has been made by our supreme court, viz., the effect of an admission made in one defense upon a square denial contained in another. It is a

strange perversion of logic that would make idle
prattle against interest admissible, while solemn (or
what should be solemn) admissions spread upon the
records of a court, and perhaps sworn to, incompe-
tent.   If a proper construction of our code permits
a defendant to befuddle an adversary and mystify
the court by pleading defenses manifestly false, and
on which he has no thought of finally relying, and
which cannot possibly be established by evidence,
why may not the evil effects of such a construction
be properly held in check by a judicial announce-
ment that such practice is perilous to the pleader
who resorts to it?   I am unwilling to add another
story to that House of Refuge for wary defendants
by so construing section 65 of our code as that a
defendant may set up every defense that a fertile
imagination can conjure up, thereby putting his ad-
versary to extra and useless labor in preparing for
trial, and then, when he, the defendant, comes into
court, he may escape entirely the consequences of his
own admissions; therefore, I favor the rule that an
unqualified admission of a fact alleged in the com-
plaint, relieves the plaintiff of the necessity of prov-
ing an allegation thus admitted, and this even when
the answer contains a general denial separately
stated.

But, defendant asserts that he could not have
plead justification or privileged occasion as a de-
fense, without first admitting that he used the lan-
guage.   In this he is mistaken.   It was not neces-
sary, in order to allege that the libelous language
expressed the truth, to admit that defendant used
or published it.   He might also have alleged that the
pamphlet in which the language appeared was a

privileged communication, without admitting that he used the words, or was responsible for their publication. It may be said that a plea in avoidance, by implication of law, is a confession, or that where one pleads in avoidance, there is present, by implication of law, an admission inconsistent with a general denial, but this is not the sort of inconsistency I am here considering.

The trial court, by Instruction No. 9, did not tell the jury that they could find that the defendant published the language, from the admissions in the answer. The court said no more than that it was competent evidence, and might be considered, in connection with all other evidence in the case, as tending to establish publication. This ruling seems to be in accord with the following cases, some of which go even further:

*Alderman v. French,* 1 Pick., 1; *Wiley v. Keokuk,* 6 Kans., 94; *Miller v. Larson,* 17 Wis., 644; *Butler v. Kaulback,* 8 Kans., 668; *Sexton v. Rhames,* 13 Wis., 99.

But, granting the contention of counsel that the instruction was improper, it was error without prejudice, since the defendant, on the stand, as well as in his answer, admitted that he had *used* the language, his contentions being (a) that he was not responsible for their publication (b) that it spoke the truth, and (c) that it was a privileged communication or a privileged occasion, and, further, the objection to the instruction (No. 9) was too general to be availing.

4.  Counsel for appellant in their brief, say:

"There was no evidence of any ill will shown against the plaintiff Stock, by this appellant, and

nothing can be drawn or inferred from the reading of this record, except that this appellant had the best of feeling toward the plaintiff.''

Having in mind the ''awful,'' if not ''unprovoked charges,'' set forth in the complaint, and which defendant admits he made against the plaintiff, we must assume, without sufficient evidence of the fact appearing, that appellant had adopted St. Paul's theory that whom the Lord loveth he chasteneth, before we can yield our assent to this statement of counsel. If this is the language appellant resorts to when speaking of one towards whom he entertains the best of feeling, it would be interesting to know what language he would employ if he had occasion to characterize the conduct of one towards whom he entertained malice or ill will. As we read the language, it bears inherent evidence of the frenzied condition of appellant's mind when he framed it. The jury were justified in believing that the purpose of its author was, in part at least, to terrorize the appellee and thus discourage her, if possible, from further litigating her claim. In the face of the advice of the attorney and secretary of his company, defendant urged that an example be made of plaintiff, win or lose, to the end that if others, then or thereafter, contemplated legal proceedings against the company, her fate might serve as a warning. Whatever rights appellant may have had, and whatever his duty to his stockholders might have been, he abused the one and exceeded the other. The evidence was sufficient to warrant the jury in finding that the defendant was responsible for the wide circulation which was given to the bitter charges which he made against plaintiff.

5. The question of the good faith of plaintiff's claim for damages, made in the personal injury case, was properly submitted to the jury, and their findings may not be reversed by this court. The size of the verdict rendered in this case would indicate neither passion nor prejudice on the part of the jury. The rulings and instructions of the trial court manifest a commendable spirit of impartiality, and are free from prejudicial error.

My associates concur in the conclusion reached, namely, that the judgment of the trial court should be affirmed, but are of opinion that a determination of the question pertaining to the right of a defendant to plead inconsistent defenses is not necessary to a decision in this case, and therefore express no opinion as to the correctness of the writer's views herein announced on that subject.

The judgment of the trial court will be affirmed.

*Affirmed.*

Decided April 8, A. D. 1912. Rehearing denied June 10, A. D. 1912.